FILED

2006 Nov-21  AM 09:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| SUZETTE KROGOL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | )   Civil Action No.: |
| | )   2:06-CV-382-IPJ |
| TURRENNE & SCHMIDT, | ) |
| ASSOCIATES, d/b/a/ TALLADEGA | ) |
| HEALTH CARE, SCHMIDT & | ) |
| WALLACE, d/b/a TALLADEGA | ) |
| HEALTH CARE, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Pending before the court is the summary judgment motion of defendant Talladega Healthcare Center, Inc. ("THC") (doc. 24).[1]  The motion was filed with a supporting brief (doc. 25) and evidentiary materials (doc. 26).  Plaintiff Suzette Krogol filed a brief in opposition to the defendant's motion for summary judgment (doc. 30) and evidentiary materials (doc. 29).  The plaintiff then filed a corrected brief in opposition to the defendant's motion for summary judgment (doc. 31) and corrected evidentiary materials (doc. 33) to which the defendants filed a reply (doc.

---

[1]The defendant, Talladega Healthcare Center, Inc., was incorrectly named as Turrenne and Schmidt Associates, d/b/a/ Talladega Health Care and Schmidt & Wallace, d/b/a/ Talladega Health Care in the plaintiff's complaint.

1

34).

## INTRODUCTION

On February 27, 2006, Krogol sued THC, her former employer, claiming that it terminated her employment in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et. seq.; the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et. seq.; and the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et. seq. (doc. 1).

## FACTUAL BACKGROUND

THC is an extended care facility and its residents include elderly individuals in need of skilled nursing care, higher function individuals unable to live alone, and individuals in need of temporary rehabilitation with the goal of returning to a private residence. Adendorff Decl. at ¶ 5. Donna Adendorff was the administrator of THC during the events giving rise to this action. Adendorff Dep. at 6; Pl. Dep. at 208-209. As the nursing home administrator, Adendorff managed all aspects of the facility. Adendorff Dep. at 6.

THC offers occupational therapy to its residents, and in June 2002, Krogol was hired by THC to work in its occupational therapy department as a certified occupational therapy assistant ("COTA") on an "as needed" basis. Krogol Dep. at

176-177.  A COTA works under the direct supervision of a registered occupational therapist ("OTR").  Krogol Dep. at 86-87; Nowell Decl. at ¶ 6.  The duties of an OTR include assessing patients and designing an occupational therapy treatment plan. Nowell Decl. at ¶ 6.  A COTA administers the OTR's treatment plan under the OTR's supervision.  Nowell Decl. at ¶ 6.  Under state regulations, a facility must have an OTR to employ a COTA because the COTA works under the license of an OTR. Adendorff Dep. at 32; Nowell Decl. at ¶ 6.

In February 2003 THC hired Krogol as a full-time COTA.  Krogol Dep. at 177, 201.  As a full time COTA, Krogol was required to administer occupational therapy treatment to patients as instructed by an OTR's plan of care, submit to the direction of the OTR, interact with patients and other facility personnel, and be present at the facility for at least 35 hours per week to treat patients and handle unexpected needs. Adendorff Decl. at ¶ 9.  At about the same time, Adendorff asked Krogol to be the occupational therapy department head.  Krogol Dep. at 192-93.  Typically, the OTR serves as the occupational therapy department head.  Adendorff Decl. at ¶ 8. However, Adendorff asked Krogol to be the department head because THC's OTR was a part-time employee and she was not suited for the department head position because of her schedule and because she was not present at the facility as Adendorff wanted the occupational therapy department head to be.  Adendorff Decl. at ¶ 8.

3

When Krogol was head of the occupational therapy department, she had a good rapport with Adendorff. Krogol Dep. at 206. Krogol was given many duties that would usually be the responsibility of an OTR such and handling Medicare denials and appeals. Krogol Dep. at 206-207. She also created "incentive-based programs" including the "Highway Home" program that was designed to encourage residents toward occupational therapy. Krogol Dep. at 35, 211-213, 223-226; Adendorff Decl. at ¶ 8.

Krogol was head of the occupational therapy department from February 2003 to December 2003. Krogol Dep. at 201. In December 2003 Adendorff hired Jennifer Nowell to replace the former OTR and Nowell took over the occupational therapy department. Krogol Dep. at 197-198; Nowell Decl. at ¶ 4; Adendorff Decl. at ¶ 8. Although Nowell became the occupational therapy department head, Krogol stated that Nowell was just her supervisor "clinically" and that she was still over the business development of the occupational therapy department. Krogol Dep. at 33-36, 86, 246, 286-287; Adendorff Decl. at ¶ 8. Nowell was present more at the facility and provided Krogol with more supervision than the previous OTR, and Krogol found the transition from working under the former OTR to working under Nowell to be stressful. Adendorff Dep. at 76-77; Krogol Dep. at 252. Krogol felt that Nowell was "bucking" her and that she was "going over [her] head and going to Donna." Krogol

4

Dep. at 230, 238, 240-241.  Krogol would ask Nowell to do things such as help with billing logs, but Krogol stated in her deposition that Nowell did not think she should have to take directions from Krogol.  Krogol Dep. at 34, 245-246.  Krogol believed that Nowell would complain to Adendorff and other coworkers about her and that Nowell was trying to lessen her credibility.  Krogol Dep. at 238, 241.

Coworkers initially liked the programs that Krogol had developed, but after Nowell arrived, coworkers started losing interest in these programs.  Krogol Dep. at 193, 221-23; 226-228.   The staff stopped following through with her programs and became disenchanted with her programs.  Krogol Dep. at 226-228, 268.  Krogol stated in her deposition that Nowell never promoted her programs, that she did not want to follow her programs, and that she thought the programs were a waste of time.  Krogol Dep. at 228-229, 268.  Krogol further stated that Nowell was "going against what I had tried to build or had built, tearing-basically just demeaning it, the Highway Home program, for example."  Krogol Dep. at 261-262.  Krogol felt that she had worked very hard in the occupational therapy department and that Nowell "shot [her] in the foot" and dismissed everything she had proposed.  Krogol Dep. at 261-263.  Krogol worked to convince Nowell to appreciate her programs and Krogol became stressed when Nowell kept "resisting everything" that she asked for.  Krogol Dep. at 229-230.  Krogol admits that promoting her programs became an obsession.  Krogol

5

Dep. at 276-77.

On February 9, 2004, Adendorff confronted Krogol about some performance problems including failing to treat patients, assigning part-time COTA Rachel Barber a higher caseload than her own caseload, taking too much time to write therapy programs, and taking too much time to develop therapy programs.  Krogol Dep. at 326; Adendorff Dep. at 54-55; Barber Decl. at ¶ 4.  Adendorff informed Krogol that development of therapy programs could not take priority over providing patients with occupational therapy treatment.  Krogol Dep. at 326; Adendorff Dep. at 54-55.  On February 10, 2004, Krogol turned in a resignation letter to Adendorff.  Adendorff Dep. at 55; Krogol Dep. at 325-326; Def.'s Ex. # 1.  The next day, Krogol asked Adendorff to disregard the resignation letter and she asked for her job back.  Krogol Dep. at 326; Adendorff Dep. at 54.  Krogol told Adendorff that she had turned in the resignation letter because she was depressed and she was not thinking rationally.  Krogol Dep. at 326.

Krogol began to feel alienated, shunned, and ostracized by her coworkers.  Krogol Dep. at 244-246, 254, 268.  Krogol believed that coworkers were talking about her negatively and that they treated her like she was "crazy."  Krogol Dep. at 238-239, 243-246, 253-254, 268.  Coworkers stopped inviting Krogol to lunch and to go out after work.  Krogol Dep. at 244-245, 253.  Krogol stated that Adendorff

stopped asking her opinions and that Adendorff started to go "straight to Jennifer." Krogol Dep. at 253, 268.  Kelli Wood, the team leader, told Krogol that she was not approachable, that she was acting strangely and that her moods were changing.  Pl. Dep. at 244, 268-269.

On March 7, 2004, Adendorff gave Krogol an employee evaluation that covered her performance from 2003 to March 7, 2004.  Adendorff Dep. at 25-26, 77-78, 81; Krogol Dep. at 208-210; Pl.'s Ex. # 1.  The evaluation described Krogol as "clinically excellent" and as a "resident advocate."  Pl.'s Ex. # 1.  Krogol was rated as "excellent" in the following job areas: job knowledge, use of equipment, learning ability, and relationship with residents.  Pl.'s Ex. # 1.  Krogol was rated as "above average" in the following areas: volume of work, quality of work, work area/office, initiative and interest, dress code, relationship with staff, relationship with supervisor, safe work practices, attends mandatory inservices, customer service/quality improvement, and budget compliance.  *Id*.  Krogol was rated as "average" in the areas of decision making skills and regular attendance.  Pl.'s Ex. # 1.  In the "overall remarks" section of the evaluation, Adendorff noted that Krogol was the lead COTA but that she was to "lead by example" rather than be "over" the other therapists in the occupational therapy department.  Pl.'s Ex. # 1; Adendorff Dep. at 78.  Adendorff discussed this issue with Krogol at the time of the evaluation to make it clear to

Krogol that she was not a supervisor over anyone in the occupational therapy department.  Adendorff Dep. at 78.  Adendorff also commented on problems with caseload assignments in the evaluation.  Pl.'s Ex. # 1; Adendorff Dep. at 79-80. Adendorff addressed this issue in the evaluation because it was the OTR's duty to assign caseloads, but Krogol had in the past organized and assigned the caseload in such a way that Barber, the part-time COTA, carried a majority of the patients while Krogol carried the least number of patients.  Adendorff Dep. at 79-80.  Lastly, Adendorff also indicated in the evaluation that Krogol was to be responsible for her own productivity and that other therapists were to turn in their reports to Kelli Wood, the therapy team leader.  Pl.'s Ex. # 1; Adendorff Dep. at 80.  Adendorff addressed this issue in the evaluation because Krogol had previously asked therapists to turn in reports directly to her when therapists were supposed to turn in reports to Wood. Adendorff Dep. at 80.

By April 2004 Krogol felt trapped, like she had been abandoned, and everyone at work had turned against her.  Krogol Dep. at 289.  She felt like she was a failure and she began to have suicidal thoughts.  Krogol Dep. at 289.  Concerned that she was a suicide risk, Krogol's husband sought mental health treatment for her.  Krogol Dep. at 288-290, 357.  On April 6, 2004, Krogol was treated by Dr. Godehard Oepen, a psychiatrist, on an emergency visit, and Dr. Oepen admitted Krogol to the hospital

8

for mental health treatment.  Krogol Dep. at 290, 357.  Krogol felt that the resistence to her initiatives at work caused her stress that exacerbated her psychological problems.  Krogol Dep. at 386-387.  After she was admitted to the hospital, Krogol's husband called Adendorff and told her that Krogol had a "biochemical imbalance" and that her medications had worn off.  Adendorff Dep. at 34-35.  Dr. Hain, a psychiatrist that treated Krogol in the hospital, diagnosed Krogol with bipolar disorder.  Krogol Dep. at 292; Oepen Dep. at 19.

On April 14, 2004, Dr. Hain faxed a FMLA form to THC requesting family medical leave for Krogol from April 7, 2004, to May 3, 2004.  Def.'s Ex. # 2.  The form stated the Krogol was receiving treatment for bipolar disorder and that she was experiencing mood swings, loss of sleep, and a decrease in energy and motivation.  Def.'s Ex. # 2.  The fax was directed to Adendorff and Adendorff initialed the form.  Def.'s Ex. # 2.

Krogol stated that the symptoms of bipolar disorder that she experiences include: mood swings, decline of interpersonal skills, irritability, loss of concentration, profound fatigue, suicidal thoughts, difficulty sleeping, difficulty communicating, difficulty concentrating, and heart palpitations.  Krogol Dep. at 368-369.  In her deposition, Krogol stated that, even with these symptoms, she could bathe, dress, groom herself, fix her hair, and do manual tasks.  Krogol Dep. at 380-

9

381. Krogol experienced some of these symptoms even when she was on medication. Krogol Dep. at 369-370.   Krogol  testified that her medications made her feel lethargic, slow, and unable to concentrate.  Krogol Dep. at 54-57.

When Krogol returned from family medical leave, she received a 3% raise. Krogol Dep. at 389.  After her return, she was still committed to implementing her programs.  Krogol Dep. at 320-322, 341-342.  Krogol believed that other employees looked down on her after she returned from her leave.  Krogol Dep. at 295.  Krogol stated that Nowell was "already through with me" when she returned from family medical leave.  Krogol Dep. at 322.  In addition, Krogol also felt as if she no longer had an "open door" to Adendorff.  Krogol Dep. at 330.  Krogol felt that when she returned from family medical leave that Adendorff took responsibilities away from her such as attending marketing meetings, developing programs, and handling denials and appeals from Medicare claims.  Krogol Dep. at 241-242.  However, Krogol admitted that there had been no Medicare denials or appeals to handle after she returned from family medical leave.  Krogol Dep. at 242-243.  Krogol also felt that Adendorff no longer requested her opinion.  Krogol Dep. at 305.   Krogol believed that her coworkers were undermining her efforts, talking behind her back, and treating her like she was crazy.  Krogol Dep. at 302, 304.

Krogol states that after she returned from family medical leave, Adendorff had

a meeting with her and Nowell to address concerns that Krogol was taking off too much time from work.  Krogol Dep. at 259.  In the meeting, Nowell expressed that she thought Krogol was taking off too much time from work and that she was putting her coworkers in a bind.  Krogol Dep. at 259.  During her deposition, Krogol testified as to the following regarding this meeting:

> A. You know, I'm beginning to think that this meeting that occurred with Jennifer was after I had gone to the hospital.  Because that was really the only time that I was taking Family Medical Leave is when I had the nervous breakdown.  So I would like to rephrase that and say that the meeting occurred after.
>
> Q. Well, Jennifer didn't say anything about Family Medical Leave, did she?
>
> A. No.  Donna - - Donna said, you mean Family Medical Leave?  She said, whatever.  She's putting us in a bind.

 Krogol Dep. at 259.

On June 7, 2004, Adendorff presented Krogol with a written warning for unprofessional behavior.  Adendorff Dep. at 12-13; Def.'s Ex. # 3.  The warning was written after Krogol called Wood a "snake" and a "bitch" and after Krogol told Wood that she was going to "take down" THC.   Krogol Dep. at 434; Wood Decl. at ¶ 4; Def.'s Ex. # 3.  The written warning stated that "further instances may result in suspension and/or termination."   Def.'s Ex. # 3.   Krogol apologized "for any unprofessional behavior that has been perceived."  Def.'s Ex. # 3.

11

Adendorff began to hear from other THC employees that patients were complaining about Krogol's treatment of them. Adendorff Dep. at 74-75. Adendorff had heard complaints about Krogol from employees from the time Nowell was hired, but Adendorff did not find that any of the previous complaints, other than the issues addressed in her March 2004 evaluation, were so significant that they needed to be handled. Adendorff Dep. at 74-75. However, Adendorff began to receive complaints about Krogol more frequently and the complaints were more significant in nature. Adendorff Dep. at 75. For example, Krogol reported that one patient was rude to her and refused treatment. Nowell Decl. at ¶ 17, D0028. The patient reported to Nowell that Krogol had told him he had to get in a chair or that his stay at THC would not be paid and that he would have to leave. Nowell Decl. at ¶¶ 12, 17, D0028. The patient was fearful of sitting in the chair because of a wound and the patient felt that Krogol had been unsympathetic. Nowell Decl. At ¶¶ 12, 17, D0028. Adendorff also learned through employees that Katherine Proctor, a resident, had also complained that she had an unpleasant experience with Krogol after Krogol placed towels and linens in front of the patient and told her to stay until she folded them. Adendorff Decl. at ¶ 10; Def.'s Ex. #6.

Nowell began to keep notes detailing specifics about Krogol's performance. Nowell Decl. at ¶ 17, D0027-D0031. Nowell noted that Krogol charged more time

12

for therapy than she actually spent with the patients on therapy.  Nowell Decl. at ¶ 15.
Nowell noted that Krogol would frequently finish treating all of her patients within
three to four hours regardless of the number of patients that she had to treat.  Nowell
Decl. at ¶ 17, D0030.  Nowell heard Krogol tell a patient that the patient needed to
do a particular task so that she could "check it off her list."  Nowell Decl. at ¶ 10.
Nowell also became concerned that Krogol could not handle patients who resisted
treatment.  Nowell Decl. at ¶ 17, D0029, D0031.

On July 26, 2004, Nowell noticed that Krogol had not completed any daily
entries or weekly notes since July 21, 2004.  Nowell Decl. at ¶¶ 16, 17, D0027.  On
the same day, Krogol called in sick, and Nowell treated a patient that Krogol had
previously seen.  Nowell Decl. at ¶¶ 11, 17, D0027.  Nowell discovered that the
patient had significantly improved from what Krogol had recorded in the patient's
file.  Nowell Decl. at ¶¶ 11, 17, D0027.  Nowell was concerned because improper
scoring of patients can mimic Medicare fraud if discovered during a audit.  Nowell
Decl. at ¶ 11.  Nowell later went back to review the documentation for the patient and
saw that Krogol had changed her previous entries to reflect a steady gradual
improvement in the patient's abilities leading up to July 26, 2004.  Nowell Decl. at
¶¶ 11, 17, D0027.  Krogol denied that she altered the patient's records.  Nowell Decl.
at ¶ 11.  On July 28, 2004, a therapist reported to Nowell that Krogol had treated a

13

resident for feeding on the previous day, but that feeding therapy was not on the patient's plan of care. Nowell. Decl. at ¶¶ 13, 17, D0027. Also on July 28, 2004, another therapist reported to Nowell that Krogol had told her that a patient had refused treatment on the previous day. Nowell Decl. at ¶¶ 14, 17, D0027. However, when Nowell visited the patient, the patient stated the Krogol had not seen him for therapy. Nowell Decl. at ¶¶ 14, 17, D0027. On July 28, 2004, Krogol arrived to work late and left early to take her daughter to an eye appointment. Nowell Decl. at ¶ 17, D0030. Nowell discovered that the evaluation sheet for a patient that Krogol treated on that day stated that she treated the patient for 45 minutes and Nowell believed that Krogol had actually treated her for less than 30 minutes. Nowell Decl. at ¶ 17, D0027-D0028.

Nowell became concerned about Krogol working as a COTA under her OTR license so she contacted her occupational therapy professors for guidance. On July 29, 2004, Adendorff met with Krogol to counsel her regarding performance problems. Adendorff Dep. at 15-16. Nowell was also present for the meeting. Nowell Decl. ¶ 20. Adendorff presented Krogol with an "employee disciplinary action/counseling form." Def.'s Ex. # 4. On the form, Adendorff noted Krogol's performance problems such as the complaints received from residents, her failure to complete documentation, and her failure to work the 35 hours per week that had been agreed

14

upon.  Def.'s Ex. # 4, D0020.   Adendorff also wrote the following on the form: "7/29/04 written warning-in order for employment to be maintained these areas must improve or termination will result."  Def.'s Ex. # 4, D0020.  Krogol refused to sign the form and she wrote a response stating that she believed the staff was resistant to the new direction she wanted to take the department.  Def.'s Ex. # 4, D0021.  She also wrote that, as to the patient complaints, she apologized for anything that "was perceived" and that she felt the resident complaints were "out of context."  Def.'s Ex. # 4, D0023.  Krogol also demanded from Adendorff specific details about the performance problems that Adendorff had presented.  Krogol Dep. at 395; Def.'s Ex. # 5.  Adendorff told Krogol that she wanted to think about it overnight and talk to Nowell about it further before she made a decision.  Krogol Dep. at 396.  Adendorff also wrote on the discipline form that "pending further review of residence complaints and above issues will inform employee of job status on 7/30/04."  Def.'s Ex. #4, D0020.

After the meeting, Adendorff met with Nowell to gather specifics regarding Krogol's performance.  Adendorff Dep. at 16;  Adendorff Decl. at ¶ 11.  Nowell told Adendorff that she was responsible for anything Krogol did in the facility with patients and that she was not comfortable with Krogol working as a COTA under her license.  Nowell Decl. at ¶ 19; Adendorff Dep. at 33.  Adendorff had never had an

15

OTR tell her that she could no longer oversee a COTA, so she took Nowell's statement seriously.  Adendorff Dep. at 67.  Nowell prepared notes detailing her concerns regarding Krogol's performance, and Adendorff reviewed the specifics regarding Nowell's concerns.  Def.'s Ex. # 5.  Krogol felt that the complaints listed were based on lies told by her coworkers.   Krogol Dep. at 400.

On July 30, 2004, Adendorff presented Krogol with the list of specifics detailing Nowell's concerns with Krogol's performance.  Def's. Ex. # 5.  Adendorff admitted that she did not personally see the events giving rise to these concerns. Adendorff Dep. at 23.  At the meeting, Adendorff informed Krogol that Nowell did not want her working under her OTR license and told Krogol that she had to let her go.  Krogol Dep at 402.  Krogol admitted that, under state law, THC could not keep her employed as a COTA if she could not work under Nowell's OTR license.  Krogol Dep. at 403.  Krogol was given the choice to resign or be terminated.  Krogol Dep. at 366, 402.   Krogol begged to keep her job and she stated that her "mind was scrambling."  Krogol Dep. at 425-426.  When Krogol was asked to resign, she asked for FMLA leave and complained that she was being treated differently because of her bipolar disability.  Krogol Dep. at 424-426.  Krogol accepted a two month severance package in exchange for resignation and release.  Krogol Dep. at 416-417; Def.'s Ex. # 7.

16

After Krogol left THC, she worked as a COTA for Solutions Therapy Services doing home care visits from September 2004 to May 2005.  Krogol. Dep. at 77-78. From February 2005 to December 2005, Krogol worked as a COTA for Louisiana Healthcare doing home care visits.  Krogol Dep. at 80.  From December 2005 to July 2006, Krogol worked for Clay County Hospital as the director of the occupational therapy department.  Krogol Dep. at 83.  Krogol quit her job at Clay County Hospital after the hospital hired a full-time OTR to replace Krogol as the occupational therapy director.  Krogol Dep. at 96-98, 101.

Krogol claims that she is disabled because of her mental impairment and that she was terminated because of her disability (doc. 1 ¶¶ 10, 15).  Krogol also claims that, while she was working at THC,  she requested that reasonable accommodations be provided so that she could perform her job and that her request was denied (doc. 1 ¶ 13).  When asked about the accommodations that she requested, Krogol stated that she asked for family medical leave and that this accommodation was given to her. Krogol Dep. at 322-323.  Krogol also testified in her deposition that she asked for accommodations when she returned from family medical leave.  Krogol Dep. at 328, 362.  Specifically, Krogol stated the following:

> I asked -- I asked her could I -- could she work with me on -- if I needed
> to be off or if I need to leave early, if I got my work done, could I go,
> you know, if things got a little -- a little bit too much for me, you know,

and I wasn't able to -- to cope at the time.  Rather than staying there and not being able to function, I wanted to function a hundred percent, and if I wouldn't function a hundred percent, then I wanted to -- I asked her could I -- could I leave, would I be excused to leave.  I was on salary.

Krogol Dep. at 328-329.  Krogol testified in her deposition that Wood, the team leader, permitted Krogol to go home when she had finished her work and she needed to relax or she needed to see her doctor.  Krogol Dep. at 334, 339, 363.  However, on other occasions, Krogol was not permitted to leave work when Nowell needed her to handle things in the department or to see a patient.  Krogol Dep. at 331.  Later in her deposition, Krogol testified that she was not accommodated because she was not given family medical leave after she was told that she could resign or be terminated.  Krogol Dep. at 366.  Krogol also testified that she requested an accommodation on the day she resigned when she asked to be placed in another position at THC.  Krogol Dep. at 374.  Adendorff denied her request to be placed in another job.  Krogol Dep. at 374-375.

Dr. Oepen, who treated Krogol from April 2004 to January 2005, stated that Krogol was diagnosed with bipolar disorder.  Oepen Dep. at 19.  When asked how THC could accommodate her bipolar disorder, Dr. Oepen testified that management could try to have an open dialogue with her, acknowledge her problem, ask her to take responsibility for the problem, and set parameters.  Oepen Dep. at 65-66.  For

example, Dr. Oepen stated that the management of THC could set the following parameters: "If you are out too many days and can't function, frankly, we can't keep you here because we need somebody to do the work.  If you ever behave unprofessionally, which may be caused by bipolar disorder, it's not acceptable.  So let's go over what's not acceptable." Oepen Dep. at 66.  Dr. Oepen also stated that, other than allowing Krogol to attend her psychiatric treatment appointments, no modified schedule would be helpful.  Oepen Dep. at 71.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The Supreme Court has explained the summary judgment standard as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex*, 477 U.S. at 322-23.  The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrates the absence of a genuine issue of material fact.  *Id.* at 323.  The burden then shifts to the nonmoving party to "go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324 (*quoting* Fed. R. Civ. P. 56(e)).  In meeting this burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  That party must demonstrate that there is a genuine issue for trial.  *See*  Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 587; and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A factual dispute regarding a non-material issue will not preclude the defendant from succeeding on a motion for summary judgment.  *Brown v. Am. Honda Motor Co.*, 939 F.2d 946, 953 (11th Cir. 1991).

## DISCUSSION

### A. ADA

Under the ADA, a covered employer cannot "discriminate against a qualified individual with a disability because of the disability of such individual in regard to

job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42. U.S.C. § 12112. "In order to establish a *prima facie* case of discrimination under the ADA, a plaintiff must demonstrate that (1) he has a disability; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination as the result of his disability." *Gordon v. E.L. Hamm & Assoc.s, Inc.*, 100 F.3d 907, 910 (11th Cir. 1996).

Under the ADA, a "disability" is a physical or mental impairment that substantially limits one or more of the major life activities of an individual, a record of such impairment, or being regarded as having such impairment. 42 U.S.C. § 12102(2). However, "[m]erely having an impairment does not make one disabled for purposes of the ADA." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195, 122 S.Ct. 681, 690 (2002). "The ADA requires that the impairment substantially limits one or more of the individual's major life activities." *Id*. A "major life activity" has been defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i).

The determination of whether a person is under a disability as defined by the ADA is done on a case-by-case basis. *Toyota Motor Mfg. Ky*, 534 U.S. at 198. "An

individualized assessment of the effect of an impairment is particularly necessary when the impairment is one whose symptoms vary widely from person to person." *Id.* at 199.  To prove disability under the ADA, a person must offer "'evidence that the extent of the limitation [caused by the impairment] in terms of their own experience ... is substantial.'" *Toyota Motor Mfg. Ky.*, 534 U.S. at 198 (quoting *Albertson's Inc. v. Kirkingsburg*, 527 U.S. 555, 567, 119 S.Ct. 2162, 1269 (1999)).

In *Pritchard v. Southern Company Services*, 92 F.3d 1130 (11th Cir. 1996), an employee sued alleging ADA violations after she was terminated.  The plaintiff was an electrical engineer and she worked mostly on nuclear facilities. *Pritchard*, 92 F.3d at 1131.   She was diagnosed with depression and she presented evidence demonstrating that her symptoms included profound fatigue, suicidal thoughts, difficulty sleeping, difficulty communicating, difficulty concentrating, and an irregular heartbeat. *Id.* at 1131-32.  The plaintiff was placed on disability leave and she was treated for depression and dysautonomia. *Id.* at 1132.  Her doctor eventually said she could return to work, but not in the nuclear field because the stress related to working in the nuclear field exacerbated her symptoms. *Id.*  However, when the plaintiff returned to work, her employer did not transfer her. *Id.*  The plaintiff claimed that she was substantially limited in her ability to function, sleep, concentrate, and communicate. *Id.* at 1132.   The court held that the plaintiff

"present[ed] a case for a jury to determine whether [plaintiff] suffered from those symptoms when she was terminated, and whether those symptoms substantially limited a major life activity." *Id.* at 1134.

The plaintiff in this case claims that she is disabled because of her mental impairment and she claims that she was terminated because of her disability. Compl. at ¶¶ 10-11, 15. However, it is unclear what "major life activity" the plaintiff claims to be substantially limited in performing. In the plaintiff's brief in opposition to the defendant's motion for summary judgment, the plaintiff admits that her bipolar disorder did not substantially limit her ability to complete housework, cook, work, bathe, dress, perform manual tasks, or lift. Pl.'s Corrected Br. in Opp'n. to Def.'s Summ. J. Br. at page 14. Further, the plaintiff testified in her deposition that she could bathe, dress, groom herself, fix her hair, and do manual tasks even though she suffered from bipolar disorder. The plaintiff also admitted in her brief in opposition to the defendant's motion for summary judgment that she was not substantially limited in the major life activity of working in a class or in a broad range of jobs. Pl.'s Corrected Br. in Opp'n. to Def.'s Summ. J. Br. at page 14. The plaintiff further agrees with the defendant that her bipolar disorder did not limit her "abilities" to work as a COTA. *Id*. at 14. That is supported by the fact that plaintiff testified in her deposition that she worked as a COTA after she left THC. The plaintiff argues that

23

because she suffered from mood swings, decline of interpersonal skills, loss concentration, profound fatigue, suicidal thoughts, difficulty sleeping, difficulty communicating, difficulty concentrating, and heart palpitations, she is substantially limited in one or more major life activity.  The plaintiff has articulated that she suffers from some symptoms related to bipolar disorder, but she has failed to she articulate the "major life activity" that is at issue.

The plaintiff argues that under *Pritchard* there is a genuine issue of material fact whether her bipolar disorder substantially limits one or more major life activity. Specifically, the plaintiff argues that because her symptoms are the same as the symptoms suffered by the plaintiff in *Pritchard*, there is sufficient evidence to demonstrate that she was also limited in one or more major life activity.  However, the fact that the plaintiff suffers from some the same symptoms as the plaintiff in *Pritchard*, is not sufficient to create a genuine issue of material fact whether the plaintiff is also substantially limited in a major life activity.  The determination of whether a plaintiff has a disability within the meaning of the ADA is done on a case-by-case basis.  *See Toyota Motor Mfg. Ky*, 534 U.S. at 198.  The plaintiff's reference to the symptoms that she suffers does not amount to sufficient evidence indicating that the plaintiff's bipolar disorder substantially limits a major life activity. Therefore, the court finds that summary judgment shall be **GRANTED** in favor of the

defendant on the plaintiff's ADA claim.[2]

## B. FMLA

To establish a *prima facie* case of retaliation under the FMLA, a plaintiff must demonstrate that "(1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment decision; and (3) the decision was causally related to the protected activity." *Strickland v. Water Works and Sewer Bd. of Birmingham*, 239 F.3d 1199, 1207 (11th Cir. 2001). The plaintiff alleges that she was retaliated against in violation of the FMLA. Specifically, the plaintiff argues that she was retaliated when she requested and was denied leave under the FMLA on the day she was asked to resign. In the plaintiff's brief in opposition to the defendant's motion for summary judgment, the plaintiff admits that her family medical leave request and her "protected statements" were made the day she was asked to resign. Pl.'s Corrected Br. in Opp'n. to Def.'s Summ. J. Br. at page 24, n. 9. Further, in her deposition, the plaintiff stated

_____

[2]Even if the plaintiff was able to establish that she has a disability within the meaning of the ADA, the plaintiff must also prove that she was asked to resign because of her disability. *See Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (to establish a claim under the ADA, "an individual must show that he suffered an adverse employment action because of his disability"). The plaintiff has failed to present any evidence demonstrating that she was asked to resign because of her bipolar disorder. Further, the defendant presented evidence demonstrating that the plaintiff was asked to resign for legitimate, non-discriminatory reasons. Specifically, the defendant presented evidence demonstrating that the plaintiff was asked to resign because Nowell did not want the plaintiff working under her OTR license and because of the plaintiff's performance problems.

that the basis for her FMLA retaliation claim was based on THC's refusal to give her family medical leave after she was asked to resign.  Krogol Dep. at 366, 410-411, 413-414.  Because the plaintiff's request for family medical leave did not occur until after the plaintiff was asked to resign, the plaintiff has failed to present sufficient evidence that her termination was causally linked to protected activity of requested family medical leave.  There being no genuine issue of material fact as to causation, the court finds that summary judgment is due to be **GRANTED** in favor of the defendant as to the plaintiff's FMLA retaliation claim.

## C. ERISA

The plaintiff claims that she was asked to resign in violation of ERISA because she used her medical benefits and because she informed the defendant that she would use them further.  Section 1140 of ERISA prohibits the discharge of a participant "for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan."  29 U.S.C. § 1140.  "[U]nder section 1140, '[a] plaintiff must show that the employer had the specific intent to interfere with the employee's right to benefits.'" *Daughtrey v. Honeywell, Inc.*, 3 F.3d 1488, 1491 (11th Cir. 1993) (quoting *Seaman v. Arvida Realty Sales*, 985 F.2d 543, 546 (11th Cir. 1993)).  The plaintiff has failed to present any evidence demonstrating that, by asking the plaintiff to resign, the defendant had the specific intent to interfere with the

26

plaintiff's right to medical benefits.  Further, the defendant presented evidence demonstrating that the plaintiff was asked to resign because Nowell was no longer comfortable with the plaintiff working under her OTR license and because of performance problems.  Therefore, the court finds that summary judgment is due to be **GRANTED** in favor of the defendant as to the plaintiff's ERISA claim.

## <u>CONCLUSION</u>

Having considered the foregoing, the court finds that the plaintiff has failed to establish any genuine issue of material fact sufficient to allow this case to proceed to trial against THC.  It is therefore **ORDERED** that summary judgment shall be **GRANTED** in favor of the defendant, and the plaintiff's claims against this defendant shall be **DISMISSED WITH PREJUDICE**.

**DONE** and **ORDERED** this the 21st day of November 2006.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE